IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

LEE A. MORRIS,

        Plaintiff,

vs.

CONAGRA FOODS, INC.,

        Defendant.

No. C04-3003-MWB

MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

TO BE FILED UNDER SEAL

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
      *1.   Undisputed facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
      *2.   Disputed facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
      *1.   The complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
      *2.   The motion for summary judgment* . . . . . . . . . . . . . . . . . **10**

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
   *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . **11**
   *B. Timeliness Of The Administrative Charge* . . . . . . . . . . . . . . . . . . **13**
      *1.   Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . **13**
      *2.   Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
           *a.   Limitations period for the administrative charge* . . . **15**
           *b.   Continuing violations* . . . . . . . . . . . . . . . . . . . . . **20**
   *C.   Morris's Hostile Environment Claim* . . . . . . . . . . . . . . . . . . . **26**
      *1.   Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . **26**
      *2.   Federal and Iowa law claims* . . . . . . . . . . . . . . . . . . **27**

  3.  *The prima facie case* . . . . . . . . . . . . . . . . . . . . . . . . . 28
    a.  *Based on race* . . . . . . . . . . . . . . . . . . . . . . . . . 29
      i.  *Race-based comments and conduct* . . . . . . . . 29
      ii.  *Race-neutral comments and conduct* . . . . . . . 30
      iii.  *Looking for the tie* . . . . . . . . . . . . . . . . . . . 31
    b.  *Actionable harassment* . . . . . . . . . . . . . . . . . . . . . . 33
 D. *Morris's Retaliation Claim Under Chapter 91A* . . . . . . . . . . . . . . 38
  1.  *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . . 38
  2.  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

III. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

In this hostile work environment employment discrimination action, the plaintiff, a sanitation worker, alleges the only aspect of his work environment that was kept clean was the equipment he sanitized. The plaintiff, contending the defendant should have cleaned up more than just its machinery, has filed both federal and state hostile work environment claims against the defendant. In response, the defendant has moved for summary judgment, claiming certain facets of the plaintiff's race discrimination claims are time barred under both Title VII and Iowa Code Chapter 216. The plaintiff has resisted the defendant's motion, asserting his claims are timely because the harassment he endured over the course of several months constituted a continuing violation, thus tolling the limitation periods enunciated in both Title VII and Iowa Code Chapter 216. Failing its procedural defense, the defendant asserts the familiar incantation that the plaintiff cannot establish a *prima facie* case regarding his race discrimination claim under a hostile work environment theory. Specifically, the defendant contends the conduct the plaintiff complains of is not actionable under Title VII because the statute was not intended to

provide relief from "the ordinary tribulations of the workplace."[1]

The plaintiff has also filed a state wage dispute retaliation claim against the defendant based on facts inextricably intertwined with his employment discrimination claim. The defendant has moved for summary judgment with respect to this claim on the grounds the plaintiff was not underpaid and therefore, is not entitled to relief. In the alternative, the defendant argues the plaintiff was not discharged, but rather, voluntarily abandoned his position. In response, the plaintiff asserts he has stated a viable claim under Iowa's Wage Payment Collection Law and that he was constructively discharged because he was not allowed to return to work.

## I. INTRODUCTION
### A. Factual Background

The core undisputed facts and sufficient detail of the disputed facts are set forth below to put in context the parties' arguments for and against summary judgment.

### 1. Undisputed facts

The defendant, Conagra Foods, Inc. ("Conagra"), is an international conglomerate that operates a facility in Britt, Iowa. At the time of the alleged misconduct, Conagra employed approximately 134 individuals at the Britt location, including the plaintiff, Lee Morris. Morris is an African-American male, residing in Hancock County, Iowa. He was initially hired by Conagra on November 30, 2000, as a third-shift sanitation worker. Morris was the only African-American employed on the third shift, and possibly the only

---

[1] *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). (internal quotations and citation omitted).

African-American working at the Britt plant throughout his employment.

In May of 2002, Morris began making complaints to his supervisors and managers about problems he was experiencing with another coworker, Daniel Godinez. Conagra hired Godinez on May 6, 2002, also as a third-shift sanitation worker. Shortly after Godinez was hired, Morris told his supervisor, Aaron Long, that Godinez had intentionally sprayed him down with a pressure hose and purposely bumped into him. Morris indicated to Long that he felt Godinez's actions were intentional because Dawn Perkins, another third-shift sanitation worker, had informed him Godinez told her he did not like black guys immediately before he sprayed Morris with the hose.[2] Long, along with another supervisor, Lyman Dickens, questioned Godinez after receiving Morris's complaint. Although Godinez denied intentionally spraying Morris with the hose, he did admit he did not like black men because he was raped by a black man when he was in prison in California.[3] Upon learning this fact, Dickens asked Godinez if he had a problem working with black people. Godinez indicated he needed the job and did not have a problem working with Morris, but that he would not be seen socializing with Morris outside of work. Although Dickens created a written report of the investigation, the report fails to mention or even imply that Godinez harbored animosity toward African-Americans.

---

[2] In her deposition, Dawn Perkins testified that Godinez stated, "I hate that fucking niggar." Deposition of Dawn Perkins, September 1, 2004, p. 26. However, from the record before this court, it does not appear these were the words relayed to Morris. Rather, Morris testified in his deposition Perkins told him that Godinez "did not like black guys." Deposition of Lee Morris, October 21, 2004, p. 16.

[3] In his deposition, Godinez stated he was raped while he was at a party, not while he was in prison. Godinez also admitted he had never been sent to prison or jail in California but stated he embellished the story because he "just didn't want to make friends . . . and wanted to be left alone and be by [him]self." Deposition of Daniel Godinez, December 22, 2004, p. 9.

Dickens's report further indicates Long told Morris that if there was any further confrontation between himself and Godinez, both men would be suspended.

After Morris made his initial complaint, Morris continued to experience problems at Conagra, most of which occurred in the locker room. Sometime during late May and early June of 2002, Morris complained to Dickens because dirty frocks and gloves were piled in front of Morris's locker. On another occasion, Morris reported to Dickens that cigarette ashes had been placed in front of his locker. Morris also voiced complaints to Dickens regarding an incident where pop was dumped in his hat and the sleeves on his uniform were taped together. Additionally, Morris reported that his rain gear was sliced with a knife on three to four occasions and his boots were cut on another occasion. In response, Dickens indicated he would try to watch the locker room more closely in order to discover who was responsible for the actions Morris complained of. Dickens did not further report the incidents, however, because he felt the conduct was typical of common locker room pranks. Morris, however, took it upon himself to further report the incidents and informed Michael Zelenak, the human resource manager, of the problems he was experiencing at Conagra. On June 12, 2002, Zelenak made a written record of Morris's complaints. The note indicates Zelenak informed Morris he would look into the problems occurring in the locker room, but that there might not be much he could find out without more information suggesting which coworker was responsible. At some point, Morris also informed Daniel Birkey, the accounting manager, and Kevin Philebar, the plant manager, about the various problems he encountered in the locker room.

On approximately June 17, 2002, Morris was transferred to the second-shift maintenance crew. After he was transferred, Morris experienced no further incidents involving Godinez or the locker room. However, approximately two to three months after his transfer to the maintenance crew, Morris made another complaint, this time concerning

a statement made by Long. Morris reported to Philebar, the plant manager, that another supervisor, Robert Bobert, told him Long referred to Morris as a "dumb black guy." Philebar conducted an investigation of Morris's complaint and talked to Long, who denied making the comment. Philebar also questioned Bobert, who denied Long had made such a statement to him. Based on his conversations with Long and Bobert, Philebar concluded Morris was not being truthful and ceased investigating his claim.

Due to an elimination in production, Morris was temporarily laid off sometime in September 2002. He was rehired approximately one month later as part of the sanitation crew.[4] Morris returned to work without incident until approximately April 25, 2003, when Conagra discovered Morris had inadvertently been overpaid approximately $13,000 in an eight-month period due to what Conagra classified as an "accounting error." Predictably, Conagra was concerned about Morris's $13,000 inadvertent bonus and sought to recoup the money. On April 25, 2003, Zelenak held a meeting with Morris, Cook, Dickens, and Birkey to discuss the situation. Although the parties dispute what transpired at the meeting, Morris returned to work that evening without incident. On April 28th, however, when Morris returned to work after the weekend, Dickens approached him with a written agreement that would essentially give Conagra permission to deduct $75.00 per week out of Morris's paycheck. Morris adamantly refused to sign the agreement. Although the parties do not agree on what was actually said to Morris, it is undisputed that Morris was sent home from work that evening. Later that week, Zelenak left a message for Morris indicating he wanted to schedule another meeting to discuss the situation. Zelenak was out of town, so Morris scheduled a meeting through Birkey for a date after Zelenak returned. Although Morris arrived at the meeting, both Zelenak and the union

---

[4]By the time Morris returned to the sanitation crew, Conagra had terminated Godinez for violation of the company's absentee policy.

representative chose not to hold the meeting due to the fact Morris had also brought along his attorney. On approximately June 9, 2003, Conagra sent Morris a certified letter indicating a decision had been made to allow Morris's return to work. The letter requested he return to work on June 16, 2003. On June 13, 2003, Conagra received a letter from Morris's attorney indicating Morris would not be returning to work in light of his prior mistreatment.

### 2. *Disputed facts*

There are several facts in dispute. With respect to the problems Morris experienced in the locker room, Morris alleges his supervisors had reason to believe Godinez was responsible for the acts. Morris alleges another coworker, Asuncio Vasques, told Morris he witnessed Godinez perform some of the acts. Morris claims he reported Vasques's observations to Dickens. Conagra denies that Morris told Dickens this fact and contends the identity of the perpetrator remained unknown. Conagra further avers that the conduct Morris complained of was nothing more than typical pranks played in the locker room. Conagra contends other coworkers experienced similar pranks including having their padlocks taped or turned backwards or their frock sleeves tied together. Because such pranks were doled out to other coworkers, Conagra claims there is no reason to believe the acts perpetrated against Morris were racially motivated. Morris disputes that the acts were "typical" pranks and contends they went beyond mere locker room humor. Further, Morris asserts the acts were performed with a racial animus, particularly in light of Godinez's admitted views toward African-Americans.

In addition to the problems Morris experienced in the locker room, he also contends he experienced other instances of racial harassment, which Conagra denies. First, Morris alleges Godinez told another coworker, Dawn Perkins, he was going to cut Morris's tires

because he was a black man.[5]  Morris asserts Conagra was made aware of Godinez's threat because Perkins reported Godinez's statement to Dickens.  Conagra denies Godinez ever made this statement and further contends it was never reported.

Second, Morris avers the recall of Conagra employees following the layoff that occurred in September of 2002 was conducted in a discriminatory manner.  Specifically, Morris alleges a white coworker, Scott Morton, was allowed to return to work in the maintenance section before Morris, even though Morton had less overall seniority in the plant.  Not surprisingly, Conagra flatly denies any type of discriminatory animus influenced the recall of its employees.  Conagra points out Morton had more seniority than Morris in the specific department in which he was called back to work, and thus was legally called back before Morris in accord with the language of the union contract.

Finally, Morris contends he experienced a racially-hostile act during the meeting that occurred on April 25, 2003.  Morris asserts that during the meeting, Zelenak accused him of owing Conagra $13,000 and called him "a thief."  Conagra denies Zelenak made such a statement and asserts that even if such a statement had been made, it does not contain racial undertones.  The parties further dispute what actually transpired during the remainder of the April 25, 2003 meeting.  Morris alleges Zelenak indicated Morris would be terminated if he did not sign a paper allowing Conagra to garnish his wages.  Morris contends he refused to have his wages garnished and terminated the meeting by walking out and informing the others in attendance they could talk to his lawyer.  Contrarily, the defendant contends Morris agreed to pay back the money and indicated he would allow Conagra to deduct $75.00 per week from his paycheck.  Conagra also asserts Morris did not mention talking to an attorney.

---

[5]  This particular comment was not relayed to Morris until after he terminated his employment with Conagra and instituted these proceedings.

The facts are also contested with respect to what occurred on April 28, 2003, when Dickens approached Morris with the written agreement. Morris contends that after he refused to sign the agreement, Dickens told him to "leave off the property." Morris contends he was fired because he was not allowed to work. Although the defendant admits Morris was sent home, the defendant takes issue with Morris's characterization of the events and contends Dickens indicated to Morris that he was not fired, but that he could not return to work until he either signed the agreement or talked to Zelenak.

These incidents will be discussed more in detail, if warranted, in the legal analysis of Morris's claims below. Suffice it to say, with respect to Morris's hostile environment claim, the defendant asserts Morris has neither offered sufficient proof the conduct was the result of a racial animus, nor demonstrated Conagra's actions were insufficient to combat the allegedly offensive conduct. With respect to Morris's retaliatory discharge claim, the defendant contends Morris was not underpaid and therefore has failed to state a claim upon which he is entitled to relief under Iowa's Wage Payment Collection Law. Alternatively, the defendant contends Morris was not discharged, but rather, voluntarily abandoned his position by failing to return to work upon his receipt of the certified letter.

## B. *Procedural Background*

### 1. *The complaint*

On January 14, 2004, Morris filed a complaint in this court alleging three causes of action against his former employer, Conagra. In his first cause of action, Morris avers he was subjected to a racially hostile work environment based upon the conduct of both his coworkers and supervisors, which included "slurs, jokes, and taunts regarding Plaintiff's race," and ultimately resulted in Morris's termination. Complaint ¶¶ 11-12. The second count of his complaint states a parallel state law claim under the Iowa Civil Rights Act

("ICRA"), Iowa Code Chapter 216, describing the same allegedly discriminatory conduct. *Id.* ¶¶ 18-20. In count three of his complaint, Morris asserts a claim under Iowa Code Chapter 91A, arguing Conagra illegally retaliated against him for disputing the amount of his wages. Complaint ¶¶ 21-24. Morris seeks damages for lost wages, emotional distress, and mental anguish, along with front-pay or reinstatement, costs, interest, attorney fees, and such other relief as is appropriate. As precursors to this lawsuit, Morris filed a complaint with the Iowa Civil Rights Commission ("ICRC") on May 2, 2003 and received an administrative release on October 17, 2003. In addition, the ICRC cross-filed Morris's complaint with the Equal Employment Opportunity Commission ("EEOC"). Morris received an administrative release from the EEOC on October 27, 2003. Conagra filed an answer to Morris's complaint on February 9, 2004, generally denying the allegations contained in all three counts. Trial in this matter is set to begin on November 28, 2005.

### 2.   *The motion for summary judgment*

Conagra filed the motion for summary judgment presently before the court on February 3, 2005, along with a brief supporting its motion and a statement of material facts not in dispute. Specifically, Conagra argues specific facets of Morris's claims under both Title VII and the ICRA are time barred because his complaint was not filed within the applicable time limitations under either statute. Failing its procedural defense, Conagra asserts Morris cannot establish a *prima facie* case regarding his hostile work environment claim. Finally, Conagra alleges Morris's claim under Iowa Code Chapter 91A must fail because Morris failed to make a complaint for unpaid wages, a precondition to asserting a retaliatory discharge claim under Chapter 91A. Alternatively, Conagra contends Morris was not discharged, but rather, voluntarily abandoned his position. On February 28, 2005, Morris filed a resistance to the defendant's motion for summary judgment, along with a brief in support of his resistance, and a response to the defendant's statement of undisputed

facts. Morris further filed his own statement of undisputed facts. Conagra filed a response to the plaintiff's statement of undisputed facts on March 2, 2005.

The defendant did not initially request oral arguments on its motion for summary judgment, but Morris requested such in his resistance. Telephonic oral arguments on the defendant's motion for summary judgment were held on September 21, 2005. At oral argument, Morris was represented by Mark D. Sherinian of Sherinian & Walker Law Firm in Des Moines, Iowa. Conagra was represented by Timothy Pugh of McGrath, North, Mullin & Kratz, P.C. L.L.O. in Omaha, Nebraska. The matter is now fully submitted and ready for a determination by this court.

## II. LEGAL ANALYSIS

The court will now turn its attention to a brief survey of the standards applicable to Conagra's motion for summary judgment, then to the application of those standards to the critical issues involved in this case.

### A. Standards For Summary Judgment

The parties here agree generally on the standards applicable to a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of

the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475

U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *Bunda*, 369 F. Supp. 2d at 1047; *Steck*, 365 F. Supp. 2d at 960; *Lorenzen*, 345 F. Supp. 2d at 984-85; *Nelson*, 335 F. Supp. 2d at 955; *see also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minn. Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)). The court will apply these standards to the motion for summary judgment by the defendant on Morris's racially hostile environment and retaliation claims.

## B. Timeliness Of The Administrative Charge

### 1. Arguments of the parties

In support of its motion for summary judgment, the defendant contends Morris failed to timely file his administrative complaint; therefore, certain conduct Morris complains of is not actionable under both the ICRA and Title VII. With respect to

Morris's claims under Title VII, Conagra argues in its brief that Morris's complaint with the ICRC was not filed until May 2, 2003, more than 300 days following the incidents that allegedly took place in June of 2002. Consequently, Conagra avers the conduct occurring outside the 300-day limitations period is not actionable. Conagra makes this same argument with respect to Morris's claims under the ICRA, arguing that Morris cannot recover for conduct that occurred more than 180 days from the filing of his initial complaint with the ICRC.

In resistance to summary judgment on his hostile environment claim, Morris contends that, viewing the evidence in the light most favorable to him, he completed the administrative process on this claim, precisely because the harassment in 2002 and 2003 was all part of a "continuing violation." Therefore, Morris argues only one of the incidents of racial discrimination had to occur within the limitations period in order for his entire claim to be deemed timely.[6] He points out the defendant does not contend his administrative complaint was untimely as to the incidents of harassment that allegedly transpired in 2003, under either the ICRA or Title VII, and that it plainly was timely as to those incidents. Accordingly, Morris argues his complaint was timely because the 2003 administrative complaint was timely filed and encompassed all the incidents of the

---

[6]In his brief, Morris actually alleges that, in order for his complaint to be timely, only one discriminatory incident had to occur "300 days *after* the ICRC complaint was filed." Plaintiff's Brief in Resistance to Defendant's Motion for Summary Judgment, Doc. No. 18-2, at 6 (emphasis added). The court assumes the word "after" is a proofreading error. It is black letter hornbook law that Title VII requires a discriminatory incident to have occurred within the 300 days *preceding* the filing of the administrative complaint. *See* 42 U.S.C. § 2000e-5(e)(1). The court will proceed to address the merits of Morris's claim under the assumption he intended to state the correct limitations requirement under § 2000e-5(e)(1)—that at least one act of discriminatory conduct had to occur within the 300 days *before* he filed his administrative complaint.

"continuing violation."

### 2.  *Analysis*

Preliminarily, the defendant contends that Morris's claims are time-barred under the limitations provisions of both Title VII and the ICRA. Therefore, before considering whether or not there are genuine issues of material fact on the elements of Morris's hostile work environment claims, the court must determine whether the claims are barred by the allegedly untimely filing of Morris's administrative charge.

#### a.  *Limitations period for the administrative charge*

Title VII makes it an unlawful employment practice for an employer to discriminate against an individual because of the individual's race. 42 U.S.C. § 2000e-2(a) (2004). Similarly, the ICRA, Iowa Code Chapter 216, is also prohibitive of discrimination based upon race. *See* IOWA CODE § 216.6(1)(a) (2003). Although the statutes prohibit the same types of conduct by an employer, they differ with respect to the time limitations in which a complainant must comply. *Compare* 42 U.S.C. § 2000e-5(e)(1) (Title VII), *with* IOWA CODE § 216.15 (12) (ICRA). Accordingly, this court will analyze the timeliness of Morris's state and federal complaints separately.

With respect to Morris's state complaint, Iowa Code section 216.15(12) requires complaints of unlawful employment practices to be filed with the ICRC within 180 days after the alleged discriminatory or unfair practice occurred. IOWA CODE § 216.15 (12). Thus, the timeliness of Morris's complaint under the ICRA turns on what date he actually filed his complaint with the ICRC. Rule 161-3.5 of the Iowa Administrative Code governs when a document is deemed to be filed with the ICRC. Pursuant to subsection (7)(a) of that rule, if a document is filed in person, "the date of the filing is the date that the document is delivered to the commission offices and date-stamped received." IOWA ADMIN. CODE r. 161-3.5(7)(a) (2005). For reasons that evade this court, both of the

parties in this case utilize April 30, 2003—the date Morris signed his complaint—as the date Morris filed his administrative complaint with the ICRC. However, Morris's complaint was not received by the commission until May 2, 2003, as indicated by the date stamped on his complaint. Thus, although contrary to both parties' assertions, pursuant to rule 161-3.5(7)(a), Morris's complaint was not filed within the meaning of the statute until it was actually date-stamped by the commission on May 2, 2003. Accordingly, his state claims are time-barred if they accrued prior to November 4, 2002.

With respect to his federal claims, complaints of unlawful employment practices generally must be filed with the EEOC within 180 days after the occurrence of the alleged act. 42 U.S.C. § 2000e-5(e)(1). However, if the aggrieved person first institutes proceedings with a state agency empowered to prosecute discriminatory employment practices, the time limit for filing with the EEOC is extended to 300 days. *Id.* Thus, under Title VII, the time in which a complainant has to file an administrative charge varies, based upon whether the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof. *Id.* States that maintain such agencies are known as "deferral states." *See, e.g.*, *Worthington v. Union Pac. R.R.*, 948 F.2d 477, 479 n.3 (8th Cir. 1991).

As noted previously, Morris initially instituted administrative proceedings with the ICRC. The ICRC does indeed have the authority to grant relief from racial discrimination. *See* Iowa Code § § 215.3 (creation) and 216.5 (duties); *see also Millage v. City of Sioux City*, 258 F. Supp. 2d 976, 984-86 (N.D. Iowa 2003) (identifying the ICRC as a deferral state agency). Consequently, because Morris filed his complaint in a deferral state with the appropriate state agency, his federal claims are subject to the 300-day limitation period. *See id.* A somewhat confusing situation arises, however, because although the ICRC

routinely cross-files complaints with the EEOC,[7] the filing is statutorily effective only as to the state commission due to the operation of 42 U.S.C. § 2000e-5(c). This section of the United States Code dictates that no charge may be filed with the EEOC "before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated." 42 U.S.C. § 2000e-5(c). Thus, even though a complaint filed in a deferral state can be immediately cross-filed with the EEOC, the administrative complaint is held in "suspended animation for 60 days or until an earlier termination of state proceedings." *Owens v. Ramsey Corp.*, 656 F.2d 340, 341 (8th Cir. 1981). This notion is mirrored in the Code of Federal Regulations which provides, in pertinent part:

> When a charge is initially presented to a [state] agency and the charging party requests that the charge be presented to the Commission, the charge will be deemed to be filed with the Commission upon expiration of 60 (or where appropriate, 120) days after a written and signed statement of facts upon which the charge is based was sent to the [state] agency by registered mail or was otherwise received by the [state] agency, or upon

---

[7]    The website of the Iowa Civil Rights Commission addresses the following "Frequently Asked Question" (FAQ):

> Q: Is there any time limit to file a complaint?
> A: Yes. You have 180 days from the date that you first found out about the discriminatory incident to file with the Iowa Civil Rights Commission. Your case will also be filed with EEOC or HUD, if these federal laws apply to your case. EEOC has a time limit of 300 days from the date of the discriminatory incident[.]

Iowa Civil Rights Comm'n, FAQ's, General Questions, *at* http://www.state.ia.us/government/crc/faqs/index.html.

> the termination of [state] agency proceedings, or upon waiver
> of the [state] agency's right to exclusively process the charge,
> whichever is earliest. Such filing is timely if effected within
> 300 days from the date of the alleged violation.

29 C.F.R. § 1601.13(b)(1). Thus, even though Morris dually-filed his complaint with the ICRC and the EEOC, this filing was only effective with respect to the state commission. His charge with the EEOC was not deemed "filed" within the meaning of Title VII until one of the three triggering events outlined in the Code of Federal Regulations occurred. *See id.*; *see also Owens*, 656 F.2d at 341 (citing *Mohasco Corp. v. Silver*, 447 U.S. 807, 817 (1980)). To avoid this conundrum, with respect to certain federal charges, Iowa has entered into a worksharing agreement with the EEOC whereby the ICRC waives its sixty-day period of exclusive jurisdiction over certain federal claims. *See* Worksharing Agreement Between ICRC and EEOC for Fiscal Year 2005 ("Worksharing Agreement"); *see also* 42 U.S.C. §§ 2000e-8(b); 2000e-4(g)(1) (authorizing the formation of worksharing agreements); IOWA ADMIN. CODE r. 161-1.6(2) (defining "deferral" and "referral" agencies). Because such waivers are self-executing, *see, e.g.*, Worthington v. Union Pacific Railroad, 948 F.2d at 481-82, when a charge in which the ICRC has waived jurisdiction is filed initially with the ICRC, it is deemed filed with the EEOC on the same date. Pursuant to the worksharing agreement, with respect to Title VII complaints, the ICRC waives its exclusive jurisdictional period under two circumstances, neither of which are applicable to the facts of this case. *See* Worksharing Agreement, § 3, ¶ A. First, the ICRC waives its jurisdictional rights in cases where the charge is initially filed with the EEOC. *Id.* As mentioned previously, Morris filed his complaint initially with the ICRC. Second, even if a charge is initially filed with the ICRC, the state commission waives its jurisdictional rights in cases where the charge is initially filed with the state commission more than 240 days after the alleged discriminatory event. *Id.* Although Morris's

allegations encompass a rather lengthy period of time, the last incident he alleged in his complaint occurred fewer than 240 days before he filed his charge. Accordingly, the ICRC retained jurisdiction over Morris's complaint, and the worksharing agreement does not help resolve the issue of when Morris's complaint was deemed filed with the EEOC.

Because Morris's complaint does not fall within the ambit of a waiver situation, his complaint was not deemed to be filed with the EEOC until either the sixty-day exclusive state jurisdiction period expired or the state terminated its proceedings, whichever occurred first. *See* 29 C.F.R. § 1601.13(b)(1) (setting forth the three events which trigger filing with the EEOC). The ICRC did not terminate its proceedings with respect to Morris's complaint until October 17, 2003—well beyond the expiration of the sixty-day exclusive state jurisdiction period, which occurred on July 1, 2003. Consequently, the first triggering event to occur was the expiration of the sixty-day exclusive state jurisdiction period, and it was on this date Morris's complaint was filed with the EEOC. *See id.* (setting forth the three events that trigger filing with the EEOC). Accordingly, his federal claims are time barred if they accrued prior to September 1, 2002.[8]

---

[8]Obviously, Morris's claims under Title VII encompass more conduct than his claims under the ICRA, due to the extended 300-day limitations period. Thus, the question becomes whether conduct that is untimely under the state statute is precluded from consideration under Title VII. This court's exhaustive research on the issue has revealed that, for the purposes of Title VII, it is of no consequence if a complainant's state claims are untimely. So long as the claimant initially filed the complaint with an appropriate State or local agency 300 days after the conduct occurred, the claimant's federal rights are preserved. *See Mohasco*, 447 U.S. at 816 n.19 ("Congress included no express requirement that state proceedings be initiated by any specific date."); *EEOC v. Shamrock Optical Co.*, 788 F.2d 491, 492-93 (8th Cir. 1986) (noting Title VII does not preclude the EEOC's authority to assume jurisdiction over an untimely-filed state administrative charge); *see also Millage*, 258 F. Supp. 2d at 984-86 (finding complainant's administrative charge was timely filed even though it was initially filed with the EEOC 298 days after the

(continued…)

Clearly, most of the allegations asserted by Morris, with the exception of his allegations surrounding his wage dispute with Conagra, concern events that predated the 180-day limitation period enunciated in the ICRA. Additionally, the entire course of conduct Morris complains of with respect to the incidents in the locker room and with Godinez fall outside of even the longer 300-day limitation period promulgated in Title VII because Morris admits he experienced no further locker room harassment following his transfer to the maintenance section on June 17, 2002. Accordingly, the incidents predating the limitation periods identified in Title VII and the ICRA are time barred unless they can be related to a timely incident as a "series of separate but related acts" amounting to a continuing violation. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (Title VII); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 741 (Iowa 2003) (ICRA). Consequently, in order to establish he exhausted his administrative remedies as to the whole of the alleged harassment, Morris is required to generate a genuine issue of material fact that the harassment predating the limitation periods promulgated by the ICRA and Title VII was part of a "continuing violation" with the harassment that occurred within the relevant time periods.

### b. *Continuing violations*

Morris correctly asserts that, with respect to his hostile environment claims, the deadlines enunciated in both the ICRA and Title VII may be varied by application of the "continuing violation exception." *See, e.g.*, *Morgan*, 536 U.S. at 117 (Title VII);

---

[8](...continued)
alleged act) (citing *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325-28 (2d Cir. 1999)).

*Farmland Foods*, 672 N.W.2d at 741 (ICRA).[9]   In its decision in *National Railroad Passenger Corp. v. Morgan*, the Supreme Court addressed what constituted the timely filing of Title VII claims and clarified the application of the continuing violation doctrine in Title VII hostile environment cases.  536 U.S. at 115-22; *see Jensen v. Henderson*, 315 F.3d 854, 858 (8th Cir. 2002) (discussing the import of *Morgan*).  In *Morgan*, the Court indicated that with respect to hostile environment claims, where each act is related to the whole, "the employee need only file a charge within [the statutory period] of any act that is part of the hostile work environment."  536 U.S. at 118.  However, the *Morgan* Court pointed out that if the acts have no relation to each other, "then the employee cannot recover for the previous acts, at least not by reference to the [more recent] act."  *Id.* Consequently, a plaintiff may not assert a continuing violation based on past isolated instances of discrimination, even where the effects persevere into the present.  *See Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980); *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1271-72 (8th Cir. 1990).

The recent decision of the Eighth Circuit Court of Appeals in *Rowe v. Hussmann Corp.*, 381 F.3d 775 (8th Cir. 2004), explains what constitutes "continuing violation" harassment under *Morgan*.   In *Rowe*, the court noted that even a lengthy hiatus in harassment does not necessarily establish that pre-limitations period and post-limitations period harassment are not part of a "continuing violation."  381 F.3d at 780 (citing

---

[9]In *Farmland Foods*, the Iowa Supreme Court cited its decision in *Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512 (Iowa 1990).  In the latter case, the Iowa Supreme Court noted the ICRA is patterned after Title VII.  *Hy-Vee Food Stores, Inc.*, 453 N.W.2d at 527.  Based on the similarities between the federal and state statutes, the court considered federal cases on the "continuing violation" doctrine instructive.   *Id.* (citing *Annear v. State*, 419 N.W.2d 377, 379 (Iowa 1988)).  Consequently, this court will utilize federal case law to analyze the timeliness of Morris's claims under both federal and state law.

*Morgan*, 536 U.S. at 118).  Rather, more pertinent factors were whether the same harasser committed the same harassing acts before and after the limitations deadline; whether the employer was made aware of the earlier harassment; and whether there was any "intervening action" by the employer that could fairly be said to have caused the later acts of harassment to be unrelated to the earlier, otherwise untimely acts.  *Id.* at 781.  In *Rowe*, the court concluded "as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action."  *Id.*  In essence, the Eighth Circuit Court of Appeals has interpreted *Morgan* to mean that, in order for a hostile environment complaint to be timely filed, "[o]nly the smallest portion of that 'practice' needs to occur within the limitations period."  *Jensen*, 315 F.3d at 859 (quoting *Morgan*, 536 U.S. at 117).  Consequently, the question before this court is whether Morris has demonstrated the alleged timely discriminatory acts are closely related enough to constitute a continuing violation or whether they constitute discrete discriminatory acts.

Unfortunately for Morris, no reasonable juror could find the alleged acts of harassment constitute one "unlawful employment practice."  First, the acts in question each involved different perpetrators holding different positions within Conagra.  Morris complains of acts performed by Godinez, a co-worker; Long, a supervisor; and Zelenak; the human resource manager.  With respect to the allegations against Godinez, Morris was transferred to the maintenance crew approximately five weeks after Godinez allegedly began his campaign of harassment against Morris.  Morris admits he experienced no further problems in the locker room following his transfer to the maintenance department.  Additionally, by the time Morris returned to the sanitation department, Godinez had been terminated for violation of Conagra's absenteeism policy.  Morris's transfer and Godinez's

subsequent termination amount to intervening acts that can be fairly said to have caused the later acts of harassment to be unrelated to the allegations against Godinez. *See Rowe*, 381 F.3d at 781 (noting intervening action by an employer is one factor courts may consider when ascertaining whether a continuing violation has manifested itself).

Additionally, each of Morris's allegations involve different patterns of harassment. Although he alleges Godinez, Long and Zelenak[10] made racial slurs either about him or to him, he also alleges disparate treatment based on the recall of Conagra employees following the layoff and a claim of retaliation. In *Morgan*, the Supreme Court specifically identified "termination of an employee, failure to promote, denial of transfer, or refusal to hire" as discrete discriminatory acts, each of which starts a new clock for filing charges alleging that act. 536 U.S. at 114. Thus, under *Morgan* and its progeny, Morris's allegations with respect to the recall of Conagra's employees and his termination constitute discrete acts of discrimination, and cannot support Morris's allegations of a continuing practice of discrimination. *See id.*; *see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 785 (8th Cir. 2003) ("Discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period."); *Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 489 (S.D.N.Y. 2000) ("[D]iscrete discriminatory acts—or discrete instances of discriminatory inaction—not related to a discriminatory policy are not a continuing violation.") (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)); *Ruffino v. State St. Bank & Trust Co.*, 908 F. Supp. 1019, 1040 (D. Mass. 1995) ("[T]he simple factual and legal intersection between an

---

[10] Morris contends Zelenak's reference to Morris as a "thief," was a racial slur because "often a 'thief' is described as a 'black man,' when newspapers and televisions [sic] give the description to the public." Plaintiff's Brief in Resistance to Defendant's Motion for Summary Judgment, Doc. No. 18-2, at 7.

underlying claim of discrimination and retaliation is insufficient to revive an otherwise stale claim."). Accordingly, in light of the different perpetrators alleged by Morris, the intervening acts of Morris's transfer and Godinez's subsequent termination, and the different harassment patterns alleged, no reasonable jury could conclude Morris has established a continuing violation as defined by *Morgan* and its progeny. *See Morgan,* 536 U.S. at 114; *see also Mems*, 327 F.3d at 785; *Cooper*, 106 F. Supp. 2d at 489 (citing *Lambert*, 10 F.3d at 53); *Ruffino*, 908 F. Supp. at 1040.

To the extent Morris is suggesting Conagra's failure to conduct a sufficiently vigorous investigation or to propose a remedy he believed would be appropriate, constitutes a continuing violation, this court rejects such an extension of the continuing violations doctrine. This argument has been made before, and rejected, in *Ruffino v. State Street Bank & Trust Co.*, 908 F. Supp. at 1039-40. *See Cooper*, 106 F. Supp. 2d at 489-90. In *Ruffino*, the complainant alleged her former employer's failure to conduct an adequate investigation or to remedy the distressing conditions contributed to the hostile work environment. 908 F. Supp. at 1039. The district court rejected the plaintiff's novel application of the continuing violations doctrine because she could not allege the employer's perfunctory investigation permitted any continuing or escalating harassment. *Id.* at 1040. The court distinguished the facts of *Ruffino* from *Maturo v. National Graphics, Inc.*, 722 F. Supp. 916 (D. Conn. 1989), a case in which a different district court found the employer's failure to respond to the plaintiff's complaints could be utilized to support her allegations of a continuing violation. *Compare Ruffino*, 908 F. Supp. at 1039-40, *with Maturo*, 722 F. Supp. at 922. The *Ruffino* court pointed out that in *Maturo*, the employer's inaction led to an escalation of the harassment within the limitations period and contributed to the intolerable conditions. *Ruffino*, 908 F. Supp. at 1039-40. Here, the facts, taken in the light most favorably to Morris, are more akin to the situation

24

addressed in *Ruffino*. Morris has not alleged, nor can it be gleaned from the record that "the blind eye turned by [his] employer permitted any continuing or escalating [harassment] within the limitations period." *See id.* Consequently, he cannot utilize Conagra's alleged failure to respond to demonstrate the presence of a continuing violation.[11]

In sum, Morris's assertions consist of nothing more than an amalgamation of discrete, isolated instances of misconduct. *See Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir. 1997). Although Godinez's conduct and the ensuing harassment that Morris endured in the locker room is reprehensible and deplorable, no reasonable jury could find a sufficient nexus between those instances of racial harassment and the remainder of the conduct Morris describes to be considered together as a continuing violation of the law. Rather, to a reasonable jury, it would appear that Morris is attempting to resurrect his untimely and unfortunately, most compelling, allegations of racial harassment involving Godinez to his more recent, yet unrelated, grievances of discrimination. The continuing violations doctrine was not designed to allow complainants to circumvent the limitations period by bootstrapping untimely grievances to timely, but unrelated, complaints. *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004) (noting the continuing violation doctrine was not intended to circumvent the rules surrounding what brings actions within the limitations period). As the Tenth Circuit

---

[11]This court notes that Morris might have been able to sustain such a contention with respect to the incidents he alleges occurred in the locker room. However, because all of the harassing conduct alleged to be performed by Godinez occurred outside the limitation periods promulgated in both the ICRA and Title VII, Morris must be able to show the inadequate investigations of the untimely conduct caused escalated harassment within the limitation periods. Morris has neither alleged, nor does the record support such a conclusion.

recently noted in a related case, "Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on discriminatory acts when they occur. Unlitigated bygones are bygones." *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1308 (10th Cir. 2005). Consequently, while the untimely conduct may be relevant as background information, it cannot provide a basis for liability under either Title VII or the ICRA. *See Kline v. City of Kansas City, Mo., Fire Dep't*, 175 F.3d 660, 665 (8th Cir. 1999) (noting harassment occurring outside the limitations period may be relevant to provide background information, but that damages could only be recovered with respect to events occurring within the limitations period), *cert. denied*, 528 U.S. 1155 (2000). Because Morris has failed to generate a genuine issue of material fact that his untimely claims are part and parcel of the same discriminatory practice, this court will proceed to only address his timely allegations with respect to the merits of Morris's claim. Accordingly, taking the facts in the light most favorable to Morris, under the ICRA the only timely incident of alleged harassment occurred in April of 2003 when Morris was terminated and called "a thief" by Zelenak. With respect to his federal claims, all of the conduct alleged by Morris may be considered, with the exception of the allegations surrounding the locker room and Godinez.

## C. Morris's Hostile Environment Claim

### 1. Arguments of the parties

The defendant avers Morris's hostile environment claims fail as a matter of law because the actions upon which the claim relies were neither severe nor pervasive. They argue the incidents Morris complains of were too sporadic to create an objectively hostile working environment because the conduct occurred over an extended period of time. Although not detailed with specificity, the defendant also contends Morris has not

proffered sufficient proof the acts he complained of were performed with a racial animus. Finally, the defendant argues its response was adequate and reasonable, and therefore, the conduct Morris complains of cannot be imputed to the defendant. In his resistance, Morris further avers the environment at Conagra was sufficiently racially hostile to be actionable. Morris also avers Conagra knew of the harassment and failed to take adequate remedial measures to prevent further incidents from occurring. Morris contends although he complained to his supervisors, his complaints were not passed along to the human resource manager or plant manager. Additionally, he alleges his complaints were minimally and inadequately investigated and that liability should be imputed to Conagra as a result.

## 2. *Federal and Iowa law claims*

This court has previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA." *Soto v. John Morrell & Co.*, 285 F. Supp. 2d 1146, 1177-78 (N.D. Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)). This is so, because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA. *See id.* at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA.")). However, federal law is not controlling, but merely provides an analytical framework for analyzing ICRA claims. *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between Title VII and the ICRA becomes critical, the court will analyze Morris's state and federal hostile environment claims together using federal precedent.

### 3.     The prima facie case

The Supreme Court instructs that hostile work environment harassment occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).   To establish a prima facie case of hostile work environment, Morris must show that: (1) he is a member of a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, in this case, on his race; (4) the harassment affected a term, condition, or privilege of employment. *Beard v. Flying J, Inc.*, 266 F.3d at 797; *Bradley v. Widnall*, 232 F.3d 626, 631 (8th Cir. 2000); *see Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999). Where the harassment was at the hands of a co-worker, and not a supervisor, the prima facie case includes a fifth element requiring the plaintiff to show that the employer knew or should have known of the harassment, but failed to take proper remedial action. *Jacob-Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir. 2002); *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 755-56 (8th Cir. 2001); *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000); *Canady v. John Morrell & Co.*, 247 F. Supp. 2d 1107, 1115 (N.D. Iowa 2003).   Conagra contends in its motion for summary judgment that Morris cannot generate genuine issues of material fact on the "based on race" element or the "affecting a term or condition of employment" element, the third and fourth elements of the prima facie case, respectively.   One major exception to the use of federal precedent to analyze discrimination claims under the ICRA is that "'the Iowa Supreme Court has never adopted the *Ellerth/Faragher* model for vicarious liability of an employer for [ ] harassment by a supervisor,' instead relying on the 'knew or should have known' standard for assessing liability" for supervisor harassment. *Soto*, 285 F. Supp. 2d at 1178 (quoting

*Stricker v. Cessford Constr. Co.*, 179 F. Supp. 2d 987, 1014 (N.D. Iowa 2001)).
However, because the contentions against Godinez have been deemed untimely by this
court, Morris's remaining allegations only concern harassment allegedly doled out by his
supervisors. Consequently, this distinction between Iowa and federal law is not implicated
at this point in the case, and the parties arguments with respect to that issue will not be
addressed.

### a.    Based on race

Conagra first contends Morris is unable to show the acts complained of were
performed with a discriminatory animus. Glossing over this argument in his brief, Morris
simply contends he was discriminated against because of his race.

### i.    Race-based comments and conduct.

Although Morris has not argued this
in his brief, it is clear to this court, taking the facts in the light most favorable to Morris,
he has generated a genuine issue of material fact that two of the three remaining incidents
at issue bear an overt indication of racial animus: (1) Morris's allegations that Long
referred to him as a "dumb black guy" in front of Bobert and (2) Morris's contention that
Morton, a white worker, was asked to return to work before Morris, in contravention of
the union contract. With respect to Morris's allegations against Long, the inference of
racial animus from the epithet "dumb black guy" when stated by a white coworker is
inescapable in this or any other context. *See Carter*, 173 F.3d at 701 ("[R]acial epithets
are often the basis of racial harassment claims, and may . . . create an inference that racial
animus motivated other conduct as well.") (citiations omitted); *see also Oncale v.
Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81-82 (1998) (inferences of discriminatory
animus must be viewed in the context in which the conduct or comments were made).
Such epithets, when used in reference to a minority by a person of a different race are
reasonably understood to have no purpose than to express racial animus. Therefore, the

court finds that the incident with Long could reasonably be viewed as race-based.

The court further concludes, taking the facts in a light most favorable to Morris, that his allegations surrounding the recall of Conagra employees in a discriminatory fashion provides an inference of racial animus, however slight. Morris alleges one white worker was called back, in contravention to the collective bargaining agreement, before Morris was allowed to return to work. If true, Morris's allegations surrounding the recall could be viewed as race-based. Thus, the court concludes Morris has generated a genuine issue of material fact with respect to whether the two aforementioned allegations were based on his race.

*ii.* ***Race-neutral comments and conduct.*** Morris's final timely claim of harassment concerns the meeting that occurred on April 25, 2003. Morris contends Zelenak's referring to him as "a thief" contains racial undertones. This court has found no case law holding or even implying that the word "thief," standing alone, conveys a discriminatory animus, nor does Morris provide support for this proposition in his brief. Morris's argument is particularly unconvincing when the attendant circumstances are examined. Morris had just learned he had been overpaid a substantial sum of money. Upon learning this information, he became agitated and refused to reimburse Conagra for the overpayment. It is more than probable that Zelenak's choice of words was dictated solely by the situation, not because of Morris's race. Further, Morris has offered no proof that any other coworker would have been treated or was treated in a different fashion under similar circumstances.[12] Consequently, this court concludes Morris has not raised a

_____

[12]It would appear this allegation would have been more appropriately pled as a disparate treatment claim, as opposed to a hostile work environment claim. The court realizes the reason it was probably not pled this way is because it was not alleged in the administrative complaint, nor can it be said to be either related to the substance of the

(continued...)

genuine issue of material fact that Zelenak's reference to Morris as a thief was overtly race-based. Additionally, the incident occurring on April 28, 2003, when Morris alleges Dickens terminated his employment with Conagra, bears no overt indication or inference of racial animus. Accordingly, this incident is also deemed to be race-neutral.

### iii.    *Looking for the tie*.

Although the court has determined Morris has identified some incidents that the court finds generate a reasonable inference of race-based animus and some that do not, that is not the end of the analysis. Morris contends a discriminatory animus can be implied into the race-neutral incidents because they are part of a pattern of discriminatory harassment. The Eighth Circuit Court of Appeals has recognized, for example, in *Carter v. Chrysler Corp.*, that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." 173 F.3d at 701 (citations omitted). In *Carter*, the court specifically added that "[h]arassment alleged to be because of sex need not be explicitly sexual in nature." *Id.* (citations omitted). The same, it would seem, would also be true of racial harassment—that is, that "[h]arassment alleged to be because of [race] need not be explicitly [racial] in nature." *See id.* at 700-01 (discussing inferences

---

[12](...continued)

allegations in the charge or reasonably be expected to grow out of the investigation triggered by the charge. *See Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 886 (8th Cir. 1998) ("[T]he plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge."). The administrative charge only outlined the incidents that occurred in the locker room and the incidents that arose out of Morris's overpayment. A disparate treatment claim, involving an entirely different factual scenario that occurred at a completely different time period, had it been asserted, would not have reasonably arose out of the investigation triggered by Morris's hostile work environment charge and therefore, would not have been properly before this court. *See id.*

of discriminatory animus in the context of claims asserting both racial and sexual harassment); *see also Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir. 1999) ("The same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment."). What the court in *Carter* concluded would establish a sexually or racially hostile environment, even in the absence of overtly sexual or racial harassment, was that the gender- or racially-neutral conduct must be "part of a course of conduct which is tied to evidence of discriminatory animus." 173 F.3d at 701. Thus, the question in light of *Carter* is whether Morris has produced enough evidence demonstrating a tie between the neutral incidents asserted by Morris and a discriminatory animus, such that the neutral incidents are impliedly tainted with racial animus.

Unfortunately for Morris, no reasonable jury could find a sufficient "tie" between the neutral conduct and a discriminatory animus. As previously discussed, Morris has serious problems generating a genuine issue of material fact that all of the actions he alleges were part of the same "course of conduct" or "pattern of harassment." The incidents involving racial content and the neutral incidents did not involve the same harassers, are otherwise unrelated factually, and occurred more than seven months apart. *See id.* (considering whether the persons who engaged in "neutral" harassment also engaged in racial taunting to determine whether the neutral harassment was part of a pattern of harassment prohibited by Title VII). Consequently, the court concludes Morris has not generated a genuine issue of material fact on the issue of whether the racially-neutral harassment identified by Morris may have been "part of a course of conduct which is tied to evidence of a discriminatory animus." *See id.* The logical extension of this conclusion is that Morris has therefore not sufficiently demonstrated the racially-neutral conduct was because of his race. Accordingly, because Morris has failed to meet his

burden as the non-moving party, the court will not consider the race-neutral conduct alleged by Morris in the remainder of its analysis.

With respect to Morris's claim under the ICRA, the only timely allegations he asserted were the incidents that occurred in April of 2003. Because he has failed to generate a genuine issue of material fact that the April 2003 conduct was based upon his race, Morris cannot establish his *prima facie* case under the ICRA. Accordingly, the defendant's motion for summary judgment is granted with respect to Morris's claim under the ICRA.

### b.    *Actionable harassment*

The element of the prima facie case that is principally disputed by the defendant is the fourth one, whether or not the harassment affected a term, condition, or privilege of employment, i.e., Morris must demonstrate the harassment is "actionable." The Eighth Circuit Court of Appeals has explained this element requires "a twofold inquiry." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005). "First, the harassment must be sufficiently severe or pervasive to create an 'objectively hostile' work environment. . . . Second, if the victim does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment." *Id.* (internal citations omitted). The prongs of this inquiry require some deeper consideration in this case.

As to the first prong of the inquiry, whether or not the environment was "objectively hostile,"

> [the environment] must be more than merely offensive, immature or unprofessional; it must be extreme. Conduct that does not exceed the threshold of severity is insufficient to create a prima facie case of sexual harassment. Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.

33

*Id.* (internal citations and quotations omitted). To put it another way,

> "[H]arassment 'standards are demanding-to be actionable, conduct must be extreme and not merely rude or unpleasant.'" *Tuggle [v. Mangan]*, 348 F.3d [714,] 720 [ (8th Cir. 2003) ] (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). "'More than a few isolated incidents are required,' and the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment.'" *Id.* (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)). [The plaintiff] must prove [her] workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

*LeGrand v. Area Res. for Cmty. and Human Servs.*, 394 F.3d 1098, 1101-02 (8th Cir. 2005).

The determination of whether or not an environment was "objectively hostile" is "a fact-intensive inquiry." *See Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001) (citing *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir. 1998)). Although a single offensive utterance or exposure to distasteful conduct ordinarily does not rise to the level of a Title VII violation, *see* Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997), there is no "rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment." *Moring*, 243 F.3d at 456. Thus, "[w]hether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct

unreasonably interfered with the employee's work performance." *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076 (8th Cir. 2005); *see LeGrand*, 394 F.3d at 1102 (identifying the same factors).

As to the second prong of the inquiry, whether or not the environment was "subjectively hostile," "'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (quoting *Harris*, 510 U.S. at 21); *accord Kratzer*, 398 F.3d at 1047 (citing *Harris*, 510 U.S. at 21). "[A]n employee's admission that [the environment] was not abusive is fatal to the employee's Title VII sexual harassment claim." *Kratzer*, 398 F.3d at 1047 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001); *Montandon v. Farmland Ind., Inc.*, 116 F.3d 355 (8th Cir. 1997)).

The only prong contested by the defendant in this case is the first prong of the inquiry, whether the environment was "objectively hostile." The only allegations Morris may rely on, based on this court's previous analysis, are the two remaining race-based incidents—Long's comment to Bobert and the alleged discriminatory recall of Conagra employees. Morris contends he has generated a genuine issue of material fact as to whether the environment was sufficiently hostile to be actionable, notwithstanding the relative infrequency of the incidents upon which his hostile environment claim relies. The defendant, on the other hand, asserts the incidents upon which Morris's hostile environment claim rely are too minor to generate a genuine issue of material fact with respect to the fourth element of a *prima facie* case for a hostile work environment. This court agrees with the defendant. Morris is only left with two isolated and unrelated incidents of alleged discrimination. These circumstances simply fail to meet the stringent standards required under Title VII. *See Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934

(8th Cir. 2002) (rejecting plaintiff's hostile environment claim based on four categories of conduct involving nine or ten incidents), *cert. denied*, 538 U.S. 994 (2003); *Scusa*, 181 F.3d at 967 (observing the plaintiff relied on only nine incidents). "Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment. *See Burkett v. Glickman*, 327 F.3d 658 (8th Cir. 2003) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The two race-based incidents asserted by Morris occurred nearly seven months apart from each other. Given the long break in time between the two incidents, it cannot be said Morris has generated a genuine issue of material fact that the alleged harassment was pervasive.

Neither, in this court's view, has Morris generated a genuine issue of material fact with respect to whether the harassment he experienced was sufficiently severe. The severity of Long's comment is tempered by the fact the comment was not directed toward Morris, nor made in his presence. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759-60 (8th Cir. 2004) (holding complainant failed to present sufficient evidence that harassment was severe where comments were not directed toward him, did not refer to him, and in some instances were merely overheard by him); *see also Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144-55 (7th Cir. 1997); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.), *cert. denied*, 522 U.S. 865 (1997). Although second-hand harassment may be significant, in the context of this case, it is less significant and less hostile than abuse specifically directed at the plaintiff.[13]

---

[13] This court does not intend to downplay the import of second-hand harassment and notes that under circumstances not present in this case, second-hand harassment may be even more egregious than harassment that is experienced first hand. For example, second-hand harassment by a supervisor that incites a racial animus in other coworkers could be the type of situation in which second-hand harassment is more severe than

(continued...)

Further, although Morris's allegation with respect to the recall of Conagra employees is serious, even in light of the other circumstances alleged by Morris, this court cannot conclude it was sufficiently severe to generate a genuine issue of material fact with respect to his hostile work environment claim. Morris has not proffered any evidence, besides his own bare allegations, that remotely implies the recall was conducted in a discriminatory fashion. As the Eighth Circuit has noted, "Mere arguments or allegations are insufficient to defeat a properly supported motion for summary judgment; a 'nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.'" *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997) (quoting *Rolscreen Co. v. Pella Prods. of St. Louis, Inc.*, 64 F.3d 1202, 1211 (8th Cir. 1995), and citing *Kiemele v. Soo Line R.R. Co.*, 93 F.3d 472, 474 (8th Cir. 1996); *JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995)); *see also Anderson*, 477 U.S. at 256-57. Additionally, even if Morris's allegations were sufficient to meet his requisite burden, this court would still find he has failed to demonstrate the harassment was so severe that it altered a term or condition of his employment. Morris only cites one instance of discrimination with respect to the recall, and Morris was only laid off one time during his tenure at Conagra. Further, Morris can only point to one person whom he alleges was called back to work at an earlier date than Morris. Notably, Morris admitted in his deposition he had less seniority in the specific department in which the coworker was called back to. Finally, Morris cannot show any further racial harassment occurred after this incident based upon this court's preceding discussion. Although Morris's allegations would more than likely be sufficient to generate a genuine issue of material fact with respect to a claim of disparate treatment, he has not asserted

---

[13](…continued)
harassment suffered first hand.

such a claim.  Instead, Morris must demonstrate a genuine issue of material fact exists that the harassment he experienced was so severe or pervasive that it altered a term or condition of his employment.  One bare allegation of discrimination, without more, is insufficient to meet this burden.  Accordingly, the defendant's motion for summary judgment is granted with respect to Morris's hostile work environment claim under Title VII.

### D.  Morris's Retaliation Claim Under Chapter 91A

#### 1.      Arguments of the parties

The defendant launches a two-prong attack on Morris's retaliation claim.  First, the defendant contends Morris failed to satisfy the precondition of making a complaint for *unpaid* wages under Iowa's Wage Payment Collection Law.  The defendant further avers Morris was not discharged, but rather, voluntarily abandoned his position.  Morris contends he is not required to make a complaint for *unpaid* wages in order to be entitled to the protections of Iowa's Wage Payment Collection Law.  He further contends he was constructively discharged because he was not allowed to return to work unless he agreed to reimburse Conagra for the overpayment he received in the form of a deduction out of his paycheck.

#### 2.      Analysis

Morris correctly states it is improper for an employer to offset any alleged overpayment of wages against an employee's unpaid wages, absent employee authorization.  *See* IOWA CODE § 91A.5 ("An employer shall not withhold . . . any portion of an employee's wages" unless required by state or federal law or authorized, in writing, by the employee); *see also Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 597 (Iowa 1999) (citing *Cameron v. Neon Sky, Inc.*, 703 P.2d 315, 317 (1985); *Nat'l*

*Med. Care, Inc. v. Zigelbaum,* 468 N.E.2d 868, 874 (1984); *P & L Group, Inc. v. Garfinkel*, 541 N.Y.S.2d 535, 537 (1989)). Morris is also correct in his assertion that Iowa's Wage Payment Collection Law prohibits an employer from discharging or discriminating against an employee who has filed a comp97laint or brought an action under Chapter 91A. IOWA CODE § 91A.10(5). Reading these two sections together, Morris asserts he has generated a genuine issue of material fact that Conagra violated Iowa's Wage Payment Collection Law. The problem inherent in Morris's argument, however, is that it glosses over the fact that wages were never actually withheld from his paycheck. Although Conagra attempted to negotiate a settlement of the wage dispute with Morris by asking him to agree that a certain sum be deducted out of his paycheck, Morris refused to sign the alleged agreement, and Conagra never resorted to a unilateral setoff. Although the Iowa Supreme Court has articulated a public policy prohibiting the termination of an employee in response to a demand for wages due, *see* Tullis v. Merrill, 584 N.W.2d 236, 239 (Iowa 1998), the issue, as this court sees it, is whether Morris has standing to assert his rights under Chapter 91A when technically, he was in fact overpaid, not underpaid.

There are no Iowa cases addressing this precise issue. Morris relies upon *Condon Auto Sales and Service, Inc. v. Crick*, 604 N.W.2d at 596-97. However, the facts in *Condon* are at odds with Morris's situation because the employer in that case actually resorted to a unilateral setoff and withheld approximately $5525 of the complainant's wages. *See* 604 N.W.2d at 596-97 (detailing the employer's unilateral setoff against the plaintiff's wages). Morris also cites an unpublished Iowa Court of Appeals's opinion. *See Butler v. Crystal Refrigeration, Inc.*, No. 01-1145, 2002 WL 31757156, at *3 (Iowa Ct. App. Dec. 11, 2002). However, this case also deals with a situation where the employer actually withheld wages. *Id.* Although not cited by Morris in his resistance, *Tullis v. Merrill* is also inapposite to the facts presented by Morris's case. In *Tullis*, the Iowa

Supreme Court recognized that, even in the case of an at-will employee, "Iowa Code Chapter 91A plainly articulates a public policy prohibiting the firing of an employee in response to a demand for wages due under an agreement with the employer." Although at first blush it appears *Tullis* supports Morris's argument, the case lends no credence to Morris's arguments because in *Tullis* and the cases referenced therein, the employers actually withheld wages from their employee's paychecks. Finding no relevant state precedent directly on point, this court may consider "'relevant state precedent, analogous decisions, considered dicta, … and any other reliable data.'" *See David v. Tanksley*, 218 F.3d 928, 930 (8th Cir. 2000) (quoting *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 847 (8th Cir. 1998)).

This court has only found one case addressing the very issue raised by Morris. *See generally Kavanagh v. KLM Royal Dutch Airlines*, 566 F. Supp. 242 (N.D. Ill. 1983). Although *Kavanagh v. KLM Royal Dutch Airlines* is distinguishable in the sense it concerned the Illinois Wage Payment and Collection Act, the Illinois Act is substantially similar to that of Iowa's. *Compare* 820 ILL. COMP. STAT. 115/9 (formerly cited as ILL. REV. STAT. ch. 48, § 39m-9), *with* IOWA CODE § 91A.5. In *Kavanagh*, the plaintiff and the employer became entangled in a wage dispute similar to the facts as alleged by Morris. 566 F. Supp. at 243. KLM, the employer, asserted the plaintiff was mistakenly overpaid $21,000. *Id.* KLM informed the plaintiff of its plans to make deductions from his paycheck in order to repay the debt. *Id.* The plaintiff retained counsel, who sent a letter to KLM advising the employer of the employee's intent to litigate any reduction in his salary or subsequent retaliatory personnel actions. *Id.* Shortly thereafter, KLM terminated the plaintiff. *Id.* In the litigation that followed, the plaintiff argued his discharge contravened the public policy articulated under Illinois's Wage Payment and Collection Act. *Id.* at 244-45. The district court, however, determined the complainant had "no

standing to assert rights under the Act because KLM never made a deduction from his salary, the *sine qua non* of a claim under the Act." *Id.* at 245. Therefore, the court concluded "it would be anomalous . . . to hold that [the complainant] was protected from retaliatory discharge because of the Act." *Id.* Likewise, this court concludes the nexus between Morris's discharge and the Iowa Wage Payment Collection Law is too attenuated. Like the complainant in *Kavanagh*, Morris essentially is asking this court to find an at-will employee cannot be terminated because of *any* dispute concerning wages, even if the employee has been fully paid, or, as in Morris's case, overpaid. *See id.* (refusing to hold that an at-will employee cannot be discharged because of any dispute with his employer concerning the payment of wages when he has retained an attorney). Such a holding would undermine the concept of the employment-at-will doctrine, which proscribes an employee at will is "subject to discharge at any time, for any reason, or for no reason at all." *French v. Foods, Inc.*, 495 N.W.2d 768, 769 (Iowa 1993). [14] Accordingly, this court concludes Morris cannot state a claim on the basis of the facts alleged, and the defendant's motion for summary judgment is granted with respect to Morris's retaliatory discharge claim.

---

[14] This court recognizes, that even in the case of employment at-will, an employer is prohibited from firing an employee "when the discharge violates a 'well-recognized and defined public policy.'" *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 203 (Iowa 1997) (quoting *Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994)). Although the Iowa Supreme Court has stated "Iowa Code chapter 91A plainly articulates a public policy prohibiting the firing of an employee in response to a demand for *wages due*," (emphasis added) the state court has never extended the public policy to encompass every wage dispute an employee has with an employer, and this court refuses to do so as well.

### III. CONCLUSION

The court finds Morris has failed to generate a jury question on his claims of racial discrimination under both Title VII and the ICRA. That is so because he did not come forward with evidence sufficient for a reasonable juror to find he was subjected to a continuous pattern of harassment based on his race or that the harassment was sufficiently severe or pervasive. Therefore, the court grants the defendant's motion for summary judgment on the plaintiff's claims of hostile work environment racial discrimination (counts I and II).

The plaintiff's sole remaining claim is his state-law claim under the Iowa Wage Collection Payment Law (count III). However, because Morris was an at-will employee who was not denied any wages, this court finds he cannot maintain a claim under Iowa Code Chapter 91A for retaliatory discharge. Accordingly, the court grants the defendant's motion for summary judgment on all counts. This case is dismissed in its entirety.

**IT IS SO ORDERED.**

**DATED** this 28th day of September, 2005.

_Mark W. Bennett_

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA